GIBSON, DUNN & CRUTCHER LLP
ORIN SNYDER (Admitted *Pro Hac Vice*)
osnyder@gibsondunn.com
200 Park Avenue, 47th Floor
New York, New York 10166-0193
Telephone: (212) 351-4000
Facsimile: (212) 351-4035

THEANE EVANGELIS KAPUR, SBN 243570
tkapur@gibsondunn.com
KATIE TOWNSEND, SBN 254321
ktownsend@gibsondunn.com
333 South Grand Avenue
Los Angeles, California 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520

Attorneys for Defendant,
Starbucks Corporation

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| CARLY E. SIMON,<br><br>       Plaintiff,<br><br>     v.<br><br>STARBUCKS CORPORATION,<br><br>      Defendant. | CASE NO. CV09-09074 GW (PLAx)<br><br>**NOTICE OF ERRATA AND JOINT STIPULATION TO SUBSTITUTE DOCUMENT**<br><br>Second Amended Complaint Filed:<br>August 12, 2010 |

**WHEREAS** on February 26, 2010, Defendant Starbucks Corporation ("Starbucks" or "Defendant") filed Document No. 27-2, Declaration of Katie Townsend in Support of Defendant Starbucks Corporation's Motion to Dismiss, or, in the Alternative, to Strike Plaintiff's Complaint, in this matter.

**WHEREAS** Exhibit A to that document, the August 9, 2007 written agreement between StarCon, LLC d/b/a Hear Music and Plaintiff Carly Simon ("Simon" or "Plaintiff"), was inadvertently filed with unredacted private information pertaining to Plaintiff.

**WHEREAS** on August 26, 2010, counsel for Plaintiff notified counsel for Starbucks of the inadvertent error and requested that steps be taken to remove said private information from the public docket, and counsel for Defendant agreed.

**THEREFORE**, the parties hereby stipulate and agree, and respectfully request that the Court enter an order, as follows:  That the true and correct copy of the Declaration of Katie Townsend in Support of Defendant Starbucks Corporation's Motion to Dismiss, or, in the Alternative, to Strike Plaintiff's Complaint, which has been redacted to conceal private information pertaining to Plaintiff and is attached hereto as **Exhibit A**, be substituted for Document No. 27-2 in the Court record and on CM/ECF.

DATED:  August 27, 2010          Theane Evangelis Kapur

GIBSON, DUNN & CRUTCHER LLP


By:  _____/s/_____

Theane Evangelis Kapur

Attorneys for Defendant,
Starbucks Corporation

1

NOTICE OF ERRATA AND JOINT STIPULATION TO SUBSTITUTE DOCUMENT

1    DATED:  August 27, 2010              Philip Bowman

2                                         BOIES, SCHILLER & FLEXNER LLP

3

4                                         By:  _____/s/_____

5                                                      Philip Bowman

6                                         Attorneys for Plaintiff,
                                          Carly Simon
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

**NOTICE OF ERRATA AND JOINT STIPULATION TO SUBSTITUTE
DOCUMENT**

# EXHIBIT A

1  GIBSON, DUNN & CRUTCHER LLP
2  ORIN SNYDER (*Pro Hac Vice* Application Pending)
   osnyder@gibsondunn.com
3  200 Park Avenue, 47th Floor
   New York, New York 10166-0193
4  Telephone: (212) 351-4000
   Facsimile: (212) 351-4035
5
6  THEANE EVANGELIS KAPUR, SBN 243570
   tkapur@gibsondunn.com
7  KATIE TOWNSEND, SBN 254321
   ktownsend@gibsondunn.com
8  333 South Grand Avenue
   Los Angeles, California 90071-3197
9  Telephone: (213) 229-7000
   Facsimile: (213) 229-7520
10 Attorneys for Defendant,
   Starbucks Corporation
11

12              UNITED STATES DISTRICT COURT

13             CENTRAL DISTRICT OF CALIFORNIA

14                    WESTERN DIVISION

15

16 **CARLY E. SIMON,**                 CASE NO. CV09-09074 GW (PLAx)

17              Plaintiff,             **DECLARATION OF KATIE**
                                       **TOWNSEND IN SUPPORT OF**
18         v.                          **DEFENDANT STARBUCKS**
                                       **CORPORATION'S MOTION TO**
19 **STARBUCKS CORPORATION,**          **DISMISS, OR, IN THE**
                                       **ALTERNATIVE, TO STRIKE**
20              Defendant.             **PLAINTIFF'S COMPLAINT**

21                                     Date:      April 1, 2010
                                       Time:      8:30 a.m.
22                                     Place:     Courtroom 10
                                       Judge:     Hon. George H. Wu
23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

---

**DECLARATION OF KATIE TOWNSEND IN SUPPORT OF DEFENDANT STARBUCKS**
**CORPORATION'S MOTION TO DISMISS, OR, IN THE ALTERNATIVE, TO STRIKE**
**PLAINTIFF'S COMPLAINT**

EXHIBIT A
3

## DECLARATION OF KATIE TOWNSEND

I, Katie Townsend, declare:

1.      I am an attorney licensed to practice law in the State of California and before the United States District Court for the Central District of California, and am an associate in the law firm of Gibson, Dunn & Crutcher LLP, counsel of record for defendant Starbucks Corporation ("Starbucks") in the above-captioned action.  I make this declaration in support of Starbucks Motion to Dismiss, or, in the Alternative, to Strike Plaintiff's Complaint.  I have personal knowledge of the facts set forth in this declaration and if called as a witness, I could and would testify competently thereto.

2.      Attached hereto as **Exhibit A** is a true and correct copy of the August 9, 2007 written agreement between StarCon LLC d/b/a Hear Music and Carly Simon.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration was executed on February 26 , 2010, in Los Angeles, California.

Katie Townsend

1

**DECLARATION OF KATIE TOWNSEND IN SUPPORT OF DEFENDANT STARBUCKS CORPORATION'S MOTION TO DISMISS, OR, IN THE ALTERNATIVE, TO STRIKE PLAINTIFF'S COMPLAINT**

Gibson, Dunn & Crutcher LLP

# EXHIBIT A

**STARCON, LLC**
**d/b/a Hear Music**
**100 N. Crescent Drive, Suite 275**
**Beverly Hills, CA 90210**

As of:  August 9, 2007

Ms. Carly Simon
c/o L. Lee Phillips, Esq.
Manatt, Phelps & Phillips, LLP
11355 West Olympic Boulevard
Los Angeles, CA 90064

<u>Re: Exclusive Record License Agreement</u>

Dear Ms. Simon:

    This letter, when signed by you and us, shall constitute a binding agreement with respect to your licensing to us the exclusive right to exploit certain Masters (as defined herein), which agreement shall be effective as of the date set forth above ("Agreement").  Carly Simon shall be referred to herein as "you" or "Artist" and StarCon, LLC d/b/a Hear Music shall be referred to herein as "we," "us," "Company," or "StarCon."  All capitalized terms used herein shall have the meanings as defined herein.

The terms that the parties mutually agree to are as follows:

**1.  Territory.**  The territory governed by this Agreement shall be the Universe ("Territory").

**2.  Term/Recording Commitment.** The term during which you shall Deliver Masters to us and shall abide by the restrictions set forth herein with respect to the exploitation of New Excluded Masters and Unreleased Masters shall consist of an Initial Period, and, if we exercise the Option, the Optional Period (collectively the "Term"):

    (a)  Initial Period.  The "Initial Period" shall begin on the date hereof and continue until the date that is fifteen (15) months after your Delivery to us of LP1.  As used herein, a "Master Recording" or "master recording" shall mean every form of recording of a musical performance, whether or not coupled with a visual image, by any method and on any substance or material or otherwise, whether now or hereafter known; and a "Master" shall mean any Master Recording embodying your performances. During the Initial Period you shall deliver to us those certain existing, previously unreleased Masters (if any) listed on **Exhibit A** attached hereto and incorporated herein by reference and those newly recorded (i.e. recorded in connection with the then current LP project), fully completed Masters, each embodying your performances as the sole featured artist thereon of a composition not previously recorded and released by you ("Existing Masters" and "New Masters", respectively) that you desire to be included on an Album to be released hereunder and that are collectively sufficient to constitute one  Album (as defined herein).  An "Album" shall mean a collection of no fewer than ten (10) Masters (which shall each be no less than two minutes and thirty seconds (2:30) minutes in length) having an aggregate playing time of no less than forty (45) minutes (an "Album").  The Album delivered during the Initial Period shall be referred to herein as "LP1."  You hereby agree to deliver LP1 to us by October 31, 2007.

PAGE 1/21 * RCVD AT 10/15/2007 8:55:12 AM [Pacific Daylight Time] * SVR:SEAMS369/17 * DNIS:32758 * CSID: * DURATION (mm-ss):05-00

000002

EXHIBIT A
6

Case 2:09-cv-09074-GW-PLA    Document 27-2    Filed 02/26/10   Page 5 of 24   Page ID #:355

(b) <u>Option Periods.</u>  We shall have one (1) option to renew this Agreement for a period commencing consecutively upon the expiration of the Initial Period (the "Option" and "Option Period", respectively).  The Option may be exercised only by written notice sent by us to you before the later of:  (i) fifteen (15) months after your Delivery to us of LP1; or (ii) thirty (30) days after your written notice to us, given to us no earlier than fourteen (14) months after your delivery to us of LP1, of your request that we decide whether to exercise the Option.  In the event that we elect not to exercise the Option, the Term shall end fifteen (15) months after your Delivery to us of LP1.  In the event that the Option is exercised by us, the Term shall end on the earlier of (i) fifteen (15) months after your Delivery to us of an Album consisting entirely of newly recorded, fully completed Masters, each embodying your performances as the sole featured artist thereon of a composition not previously recorded and released by you ("LP2"), which shall be Delivered to us no later than twelve (12) months after the Option has been exercised by us; and (ii) nine (9) months after the release of LP2.

(c) <u>Your Rights to Negate Option:</u>  Notwithstanding the foregoing, if StarCon shall have timely exercised the Option for LP2 hereunder, but:

     (i)     LP1 shall not have achieved Net Sales (i.e., gross units sold, less actual returns) of at least four hundred thousand (400,000) units worldwide (including Pipeline Sales) within twelve (12) months after its initial commercial release (the "Measurement Period") (Net Sales equal to or exceeding such threshold referred to as "Qualifying Net Sales"), or

     (ii)     you decide that you do not wish to Deliver LP2 to us due to your good faith intention to retire from recording new Masters,

then in either such case you shall have the right, exercisable by written notice given to us within thirty (30) days after the later of (A) our exercise of the Option or (B) the end of the Measurement Period, and accompanied by repayment to us of all sums (if any) paid by us to you or on your behalf in connection with the exercise of the Option or the Masters intended for LP2, to negate our exercise of such Option, in which event (assuming all such conditions were satisfied), the Term hereof shall be deemed to have expired as of the date of your such notice and full repayment.  As used herein, "Pipeline Sales" shall mean sales that have occurred at the source as of a particular date (less any actual returns thereof known to us), but which have not been reported on royalty statements rendered by us to you as of such date.  If LP1 shall have achieved Qualifying Net Sales and if you elect to negate our Option pursuant to clause (ii) above and if you subsequently change your mind and decide that you do wish to record new Masters constituting a new Album or to authorize the release of an Album of theretofore unreleased Masters that you own and control, or some combination thereof, then you shall notify us of your proposal for such new Album, accompanied by listening copies of any then-existing Masters that you desire to include therein, and we shall have, for a period of sixty (60) days following your such notice to us, the exclusive Option for such new Album on all of the terms set forth herein with respect to LP2.

(d) <u>Delivery Commitment.</u>  Your obligation to record and Deliver to us hereunder the required LPs and Masters is sometimes referred to as your "Delivery Commitment."  Each LP of your Delivery Commitment is sometimes referred to as a "Committed LP."

(e) <u>Bonus Masters.</u>  For each LP of your Delivery Commitment hereunder, if and to the extent that, in addition to the Masters to be included  on the LP, there are extra Masters available that you own and control and in your good faith judgment deem acceptable for use by us, you shall give good faith consideration to our request to use one (1) or more mutually designated such available Masters as additional or "bonus" tracks ("Bonus Master(s)") on or in connection with a Record released or to be released hereunder (e.g., to make as an "exclusive" bonus track for Best Buy, Target, or for a local

PAGE 2/21 * RCVD AT 10/15/2007 8:55:12 AM [Pacific Daylight Time] * SVR:SEAMS369/17 * DNIS:32758 * CSID: * DURATION (mm-ss):05-00

000003

foreign edition to compete against imports [e.g., in Japan] and otherwise to use, both commercially and promotionally in connection therewith. If we so request, you shall send us, for our consideration, listening copies of one (1) or two (2) (or more if you so elect) such available Master(s) that you would approve for such use, together with a statement of your direct, out-of-pocket Recording Costs theretofore incurred with respect to each such Master, and, in the event that you consider it to be necessary to incur any additional direct out-of-pocket Recording Costs in order to secure the right to exploit the Master or to make such Master suitable for use as a Bonus Master, the amount you request as a budget therefor. If we request you to Deliver any such available Master to us for use as a Bonus Master, then upon Delivery to us of the completed Bonus Master, which shall then be a Licensed Master hereunder, we will pay or reimburse you for your such direct, out-of-pocket costs up to the aggregate amount approved by us in advance therefor, which payment or reimbursement shall be in addition to the Recording Fund for such LP and shall be deductible as an Expense in computing Net Profits hereunder.

(f) **Excluded Masters.**   By way of clarification, all Masters (whether audio-only or audio-visual) that you own and control but do not Deliver to us as part of any Committed LP hereunder or as a Bonus Master are referred to herein as "Excluded Masters", whether such Excluded Masters are in existence as of the effective date hereof ("Existing Excluded Masters") or recorded during the Term ("New Excluded Masters"). We shall have no rights to exploit such Excluded Masters hereunder, and upon the expiration of the Term (and, if applicable, the Re-Recording Restriction Period) you shall have the right to exploit same for your own account. Moreover, during the Term, provided you are not then in breach of your then-current material obligations under this Agreement, you shall have the right to exploit for your sole account Existing Excluded Masters that are not Unreleased Masters (as defined below); provided, however, that you shall not release or authorize the release by any Third Party of any long-playing album (whether audio-only or audiovisual) consisting of heretofore released Masters (e.g., the albums presently entitled "The Bedroom Tapes" and "Live at the Vineyard") during any window of time beginning six (6) months prior to the scheduled release date of a Committed LP and ending six (6) months after the actual release of such Committed LP hereunder.

**3.  Creative Controls.**   You and we shall mutually approve each of the Masters to be recorded hereunder, each musical composition to be recorded, the location of the recording session, the producer and other personnel to be used, and all other elements involved in the recording of the Masters, all aspects of any so-called music videos (if any), including, without limitation, the director, story board, locations and edits and all other creative assets, e.g., the Artwork for each Committed LP, but Artist shall have final creative control with respect to all of the foregoing; provided, however, that StarCon shall have the right to disapprove and require that Artist delete or modify to StarCon's reasonable satisfaction any content that StarCon, in its good faith judgment, believes will be unacceptable to any significant retail account or may be violative of the rights of any Person, or may otherwise be objectionable or offensive to any segment of or to a significant portion of the public ("Unacceptable Content"). If StarCon determines that any element of any Master or other content delivered to StarCon for exploitation hereunder is Unacceptable Content, it shall promptly advise Artist thereof in writing and shall provide Artist with a reasonable time to revise or replace the Unacceptable Content. Artist acknowledges that StarCon is under no obligation to produce a music video. The parties mutually approve Artist, Jimmy Webb and Frank Filipetti as co-producers of LP1. No Masters will be recorded "live" without our prior consent and none of the Masters shall feature compositions which were previously recorded by you and which have been commercially released by any party. Each Master hereunder shall be subject to our approval as being technically satisfactory for the manufacture of Records, which approval we shall not unreasonably withhold. We hereby acknowledge and agree that: (a) we shall not have the right to treat as Unacceptable Content any Artwork prepared by us and approved by you for use hereunder, and (b) there is no Unacceptable Content in the lyrics to the musical compositions that you have advised us will be contained on LP1 hereunder, which compositions are listed on Exhibit B attached hereto.

Simon.006 – 10/09/07

000004

EXHIBIT A
8

### 4. Delivery.

(a) You shall Deliver (as defined herein) to StarCon a completed, fully-edited, mixed and equalized two-track stereo recording of each Master, in the format customarily used by StarCon for the manufacture of commercial Records at the time of Delivery (presently a Production Master CD or DDP Master) ("Production Master CD"). Provided you have complied with your other material obligations hereunder and StarCon is in receipt of all items described in paragraph 4(b) below, the date of Delivery shall be the date that Artist delivers to StarCon such Production Master CD. You shall deliver at the same time a duplicate of any hard drive(s) used principally to store the Masters and a duplicate original of the multi-track master tapes recorded in connection with the recording project including, without limitation, any twenty-four (24) track master tapes. The two-track stereo master shall be fully edited, mixed, equalized and leadered for the production of parts from which satisfactory Records can be manufactured. All such discs, tapes, and/or drives (together with the information specified in paragraph 4(b) below) shall be delivered to StarCon's A&R Administrator at the address specified on page 1 hereof. StarCon shall have the right to maintain copies of all Delivery items, and upon your request, StarCon shall return all Delivery items to you at the end of the Exploitation Period.

(b) As used in this Agreement, "Delivery" shall mean the receipt by StarCon of the two track stereo masters as provided in paragraphs 4(a) together with all necessary information, consents, licenses and permissions that StarCon may reasonably require to manufacture, distribute and release the Records concerned including, without limitation, all label copy, publishing and songwriting information (including without limitation, applicable music performance rights organizations, and the names, addresses and telephone numbers of publishers), LP credits, the timings of and lyrics to each composition contained on a Record, first use mechanical licenses (although, at your request, StarCon shall use its reasonable efforts to assist you in documenting those licenses, without limiting your responsibility therefor), permissions from both the performer and the applicable record label for all co-featured artists, guest artists and all sidemen and vocalists who are exclusive to any other record label and any information required to be delivered to unions, guilds or other third parties.. Delivery will also include a reference disc approved by StarCon from which metal (or the then-equivalent) parts can be prepared. StarCon's election to make a payment to you which was to have been made upon Delivery of Masters or to release a Record derived from such Master shall not be deemed to be an acknowledgment that such "Delivery" was properly made, and StarCon shall not be deemed to have waived either its right to require such complete and proper performance thereafter or its remedies for your failure to perform in accordance therewith.

(c) At such time as you have completed your Delivery obligations in connection with a Committed LP, you shall send us a written notice, to the attention of StarCon's Vice President, Business and Legal Affairs, that you have Delivered the applicable Committed LP to us. In the event that you in good faith send us notice of Delivery, and if we do not within ten (10) business days of your such notice, notify you of any deficiencies in your Delivery obligations, such Committed LP shall be deemed Delivered to and accepted by us as of the date specified in your such notice to us. In the event that we, within ten (10) business days of your such notice, notify you of any deficiencies in your Delivery obligations, such Committed LP shall be deemed Delivered to and accepted by us as of the date that you cure such deficiencies and send us written notice thereof.

### 5. Recording Funds and Procedure.  For each LP required to be delivered hereunder, we shall provide the applicable all-in recording fund as set forth below ("Recording Fund"). The Recording Fund shall be inclusive of all Recording Costs (as defined below) and all sums payable to you and all third parties in connection with the recording of the LP.

(a) With respect to LP1, the Recording Fund shall be Five Hundred and Seventy-Five Thousand

Simon.006 - 10/09/07

Page 4 of 21

000005

EXHIBIT A

9

Dollars ($575,000.00), which shall be paid to you as follows: (i) fifty percent (50%) (i.e., $287,500.00) upon the full execution of this Agreement; and (ii) the balance (i.e., $287,500.00, less any payments of Recording Costs that StarCon may make directly, if any) upon the later of: (A) full execution of this Agreement; and (B) Delivery to us of LP1.

(b)   With respect to LP2, if StarCon shall elect to exercise the Option therefor, we shall provide you with a Recording Fund equal to sixty-six and two-thirds percent (66 2/3%) of the amount earned by you as Your Share of Net Profits of LP1, computed as the date which is twelve (12) months after the initial United States release of LP1.   Notwithstanding the foregoing, in no event shall the Recording Fund for the Optional LP hereunder be lower than the minimum amount of Five Hundred and Seventy-Five Thousand Dollars ($575,000.00) or greater than the maximum amount of Seven Hundred and Fifty Thousand Dollars ($750,000.00).

(c)   For each Committed LP hereunder, should the Recording Costs exceed the Recording Fund other than as a result of StarCon's sole acts or omissions, you shall be solely responsible for any such excess amount and in the event that we pay such excess we shall have the right to deduct the entire excess amount from any monies payable to you at anytime, including, without limitation, from any advances and any future Recording Funds.

(d)   We shall pay the amount of the Recording Fund for LP2 as follows: (i) twenty-five percent (25%) upon our exercise of the Option therefor; (ii) twenty-five percent (25%) upon the commencement of recording sessions therefor; and (iii) the balance upon your Delivery to us of LP2, provided that we shall be entitled to hold a reasonable reserve (to be liquidated if unused within thirty [30] days after Delivery) for any then unpaid Recording Costs that have been or that we reasonably anticipate will be invoiced to us.   Subject to the foregoing, you shall pay all Recording Costs as and when due.

(e)   Upon your submission to us of reasonably satisfactory evidence of the amount of your actual direct out-of-pocket Recording Costs paid to third parties in connection with a Committed LP ("Your Actual Recording Costs"), we shall subtract from the amount of the Recording Fund for such LP the sum of (i) Your Actual Recording Costs of such LP and (ii) our actual direct, out-of-pocket Recording Costs in addition thereto, if any (said sum the "Actual Recording Costs" of such LP), and only the net amount remaining after such subtraction shall be treated as an advance ("Your Net Cash Advance") against and recoupable from Your Share of Net Profits hereunder.   The Actual Recording Costs of such LP shall instead be deductible as Expenses in computing Net Profits hereunder.

(f)   "Recording Costs" shall mean all costs customarily regarded as recording costs in the United States recorded music business, including, without limitation, the following costs: musician, arranger and copyist payroll costs (inclusive of pension and welfare payments); fees or advances paid to the producer (except that no separate producer fee shall be paid to Artist in the event that Artist produces any of the Masters), engineer or any other required personnel; studio or venue rental; equipment rentals and cartage; the cost of tape and other required materials; transportation, food and lodging expenses for all personnel involved in the recording; transportation, food and lodging expenses, within reason, for any of our employees who attend recording sessions; fees incurred on account of delayed or canceled recording sessions, provided that such delays or cancellations were not caused by us; and any and all other costs incurred in connection with the production of the completed Album with all Masters therein being fully edited, mixed and mastered ("Recording Costs" herein).   The Recording Funds herein shall be inclusive of your union scale wages and we shall have the right at any time to advance to you such additional moneys as we desire in order to comply with any minimum requirements under the California Code of Civil Procedure, or other laws or regulatory codes, for the purposes of obtaining injunctive or other equitable relief.   Should the Recording Costs exceed the Recording Fund without our prior written consent due to your gross negligence or other fault, you shall be solely responsible for any such excess amount and in the event that we pay such

Simon.006 – 10/09/07

Page 5 of 21

000006

EXHIBIT A
10

excess we shall have the right to deduct the entire excess from any monies payable to you at any time, including, without limitation, from any advances and any future Recording Funds.

(g)  Notwithstanding the foregoing, in the event that we shall commercially release an LP prior to your complete fulfillment of the Delivery requirements for such LP, then, solely for the purpose of paying the balance of the Recording Fund for the applicable LP, such LP shall be deemed Delivered and we shall pay you the balance of the Recording Fund promptly following the release of the LP. Our election to pay the foregoing balance(s) shall not be deemed to be an acknowledgment that "Delivery" was properly made, and we shall not be deemed to have waived either our right to require such complete and proper performance thereafter or its remedies for your failure to perform in accordance therewith.

(h)  Recording Procedure.  (i) You shall be solely responsible for arranging all recording sessions and engaging all personnel in connection therewith, including, without limitation, producers.  With respect to any producer(s) that you engage, you shall obtain a release from the producer for services rendered in connection with the Masters acknowledging that producer's services are being engaged on a work for hire basis.  Prior to Delivery of any Masters, you shall notify StarCon in writing of any portions of musical compositions or other copyrightable material owned by a third party, and/or any portions of recordings owned by a third party, which are intended to comprise part of any Master ("Sample"). You shall not be deemed to have completed your obligations with respect to the Delivery of any LP or Master that includes a Sample until such time that you have delivered to StarCon fully executed licenses for each such Sample (including both the master recording and musical composition, if applicable) granting to you and your designees, including StarCon, its distributors, licensees and sublicensees, rights therein that are sufficiently broad, in the reasonable opinion of StarCon's legal counsel, to allow StarCon to exploit the applicable Master as fully hereunder as if no Sample were included therein.

(ii)  You shall be solely responsible for paying any and all non-recoupable fees (if any) and all advances (if any) payable to any producer of any of the Masters.  However, you and we shall mutually approve the basic royalty rate payable to each producer of any Master(s) hereunder, which royalties shall be computed and paid utilizing a methodology that is either the same as or compatible with the methodology utilized by us in computing royalties generally.  Provided that the applicable producer royalties are mutually approved as aforesaid, StarCon will render royalty statements to and pay royalties to each third party producer engaged by you, at the same times as royalty statements and payments are due to you hereunder, all pursuant to a customary so-called "letter of direction" in a form reasonably satisfactory to us.

(iii)  If you elect to use the services of any employee of StarCon to produce any of the Masters hereunder, then you and we shall negotiate in good faith an appropriate royalty to be deducted and retained by StarCon and/or an appropriate fee to be paid by you to StarCon for such services.

(i)  With respect to your Delivery of Masters in satisfaction of your Delivery Commitment, time is of the essence and your failure to make timely Delivery of any such Masters shall constitute an event of default, subject to a cure period of ninety (90) days.  If you are delinquent in the Delivery of any Masters hereunder, then the next delivered Masters shall be deemed to satisfy the most delinquent requirements first, and you may not commence the recording of Masters constituting any particular LP until you shall have delivered to StarCon all Masters constituting each prior LP.

6.  Release Commitment.  (a)  Provided that you are not in material breach hereunder, StarCon shall release in the United States each Committed LP Delivered hereunder within six (6) months after Delivery by you of such LP.  If StarCon fails to release any Committed LP as aforesaid, your sole remedy shall be the right after the expiration of such 6 month period to give StarCon written notice of such failure. If StarCon fails to release the applicable LP in the United States within ninety (90) days after receipt of such notice, you

Simon.008 - 10/09/07

000007

shall have the right, as your sole remedy, after the expiration of such 90 day period to terminate the Term hereof by written notice to StarCon; provided that if StarCon shall release the applicable LP in the United States prior to Company's receipt of such notice, then such notice shall be of no force or effect. If you properly terminate the Term of this Agreement as a result of StarCon's failure to release any Committed LP hereunder in accordance with this paragraph, then you shall have the option, exercisable by written notice to StarCon accompanied by payment of an amount (which amount we shall notify you of upon your request) equal to one-half (1/2) of the sum of the applicable Recording Fund and the direct, out-of-pocket Artwork costs spent by StarCon for such LP, to cancel all of StarCon's rights with respect to such LP and the related Artwork.

(b)   Provided you have fulfilled all of your material obligations under this Agreement, StarCon shall (i) release each Committed LP in Canada, the United Kingdom, the European Economic Community and Japan (the "Foreign Distribution Territories") within six (6) months after its initial United States release date, and (ii) cause each Committed LP to be released in Australia within nine (9) months after its initial United States release date (the Foreign Distribution Territories and Australia collectively the "Major Foreign Territories"). In the event that StarCon fails to release or cause to be released a particular Committed LP in any Major Foreign Territory within the aforementioned time period, and if you thereafter notify StarCon of such failure and of your desire to obtain a release of such Committed LP in the specified Major Foreign Territory, then StarCon shall release same or cause same to be released in the specified Major Foreign Territory within sixty (60) days after written notice from you, and if StarCon fails to effectuate such release within such 60 day period in the specified Major Foreign Territory, then the rights with respect to such Committed LP for such specified Major Foreign Territory shall immediately revert to you for your sole account (i.e., you shall have the right to license such Committed LP to a third party of your choice for release solely in such Major Foreign Territory or Territories, with 100% of the proceeds from such license being payable to you).

(c)   The running of each of the six (6) month and three (3) month periods referred to in paragraphs 6(a) and 6(b) will be suspended (and the expiration date of each of those periods will be postponed) for the period of any suspension of the running of the Term of this Agreement. If any such six (6) month and three (3) month period would otherwise expire on a date between November 1 and the next January 16, its running will be suspended for the duration of the period between November 1 and January 16 and its expiration date will be postponed by the same amount of time (i.e., seventy-seven (77) days).

### 7. Grant of Rights; Restrictions.

(a)   Ownership of Masters.   StarCon acknowledges that the copyrights in the Masters shall from inception be owned by you. You shall register each of the Masters for copyright protection in the United States within ninety (90) days after its initial release on Records hereunder and you shall furnish us with a copy of each such registration as and when filed.

(b)   Exclusive License to StarCon.   You hereby exclusively license to StarCon all right, title, and interest, including the copyright, throughout the universe in and to each of the Masters Delivered or required to be Delivered to us hereunder (collectively, "Licensed Masters") for a period of time commencing on the date hereof and continuing until the date that is the earlier of (i) seven (7) years after the last day of the semiannual accounting period ending June 30 or December 31 during which the final Committed LP is commercially released hereunder (or if such LP shall not have been commercially released, then the last day of the semi-annual period in which the final Committed LP was delivered) or (ii) seven (7) years and six

Simon.006 - 10/09/07                              Page 7 of 21

PAGE 7/21 * RCVD AT 10/15/2007 8:55:12 AM [Pacific Daylight Time] * SVR:SEAMS369/17 * DNIS:32758 * CSID: * DURATION (mm-ss):05-00

000008

EXHIBIT A
12

(6) months after the last day of the semiannual accounting period ending June 30 or December 31 during which the final Committed LP is Delivered (the "Exploitation Period"). Without limiting the foregoing, StarCon and its designees shall have the unrestricted right to sell Records (as hereinafter defined) derived from the Licensed Masters and to otherwise exploit the Licensed Masters in any manner and in any and all media, whether now known or hereafter devised, or, except as expressly stated herein to the contrary, StarCon may refrain therefrom, all in its sole discretion. Upon the expiration of the Exploitation Period, StarCon and its designees shall cease the manufacture of all Records embodying the Licensed Masters, except with respect to any multi-artist compilation Records released with your written consent to a longer exploitation period (it being agreed that it will not be deemed unreasonable for you to refuse to consent to the inclusion of a Licensed Master in a multi-artist compilation Record for which the proposed exploitation period would continue beyond the Exploitation Period hereunder). During the six (6) month period immediately following the Exploitation Period (the "Sell-Off Period") StarCon and its designees shall have the non-exclusive right to advertise, promote, distribute and sell Records embodying solely the Licensed Masters, and upon the expiration of the Sell-Off Period all such Records shall be destroyed; provided, however, that you shall have the right to elect, by notice given to us within thirty (30) days after the end of the Sell-Off Period, to purchase in cash any or all of our then-remaining inventory of Records in physical form embodying solely Licensed Masters hereunder at our cost of manufacture. You shall be responsible for all costs of shipping in connection therewith. StarCon agrees that it shall not manufacture quantities of Records embodying solely Licensed Masters hereunder in anticipation of the Sell-Off Period in excess of its reasonably anticipated consumer demand therefore during the Exploitation Period. StarCon agrees that during the Sell-Off Period, we shall not sell Records embodying solely Licensed Masters hereunder at so-called "distress prices." Upon the expiration of the Exploitation Period, you shall execute any and all necessary or appropriate assumption agreements with all applicable unions, and you shall assume all obligations and liabilities regarding your exploitation of the Licensed Masters. As used herein, the term "Phonograph Record(s)", "Record(s)" or "records" shall be defined as all forms of reproduction, transmission, communication or distribution now or hereafter known, including reproductions of sound alone or sound accompanied by visual images, which are manufactured or distributed primarily for individual use, including, without limitation, compact discs, analog cassettes, digital audio tapes, video discs, digital versatile discs, mini-discs, vinyl records, CD-ROM, and any form of so-called digital distribution. StarCon shall also have the right to publicly perform and to authorize or permit the public performance of the Licensed Masters, as well as any derivatives and reproductions thereof.

(c) Ownership of Artwork. Whether created by StarCon alone, by you alone, or created by the two of us, you shall own all right, title and interest, including the Territory-wide copyright, in and to any artwork, drawings, photographs, liner notes, or other graphic or textual works (collectively "Artwork") used on or in connection with any Committed LP, and you hereby exclusively license to StarCon the right to use the Artwork in connection with the promotion and sale of Records for the Exploitation Period and non-exclusively for the Sell-Off Period. You hereby acknowledge that StarCon shall create the Artwork for each Committed LP, such Artwork to be subject to your mutual approval, which shall not be unreasonably withheld or delayed so as to frustrate the intent hereof. However, in the event that Artist requests to create the Artwork for LP2 and StarCon consents, such Artwork shall be subject to StarCon's mutual approval, which StarCon shall not unreasonably withhold or delay so as to frustrate the intent hereof, and StarCon shall pay or reimburse Artist for the actual, direct out-of-pocket costs of creating the Artwork up to a maximum amount of Twenty Thousand Dollars ($20,000.00), and the Artwork shall be a material element required to be Delivered to StarCon in order to constitute Delivery of the LP.

(d) <u>Name and Likeness.</u>  We shall have the Territory-wide right during the Exploitation Period and the Sell-Off Period to use your name, voice, approved photograph, approved likeness, approved biographical data and other approved identification as well as any symbols, logos, trademarks, tradenames or similar properties relating to you in connection with the manufacture, sale, distribution, advertising and promotion (including, without limitation, free promotional merchandise related solely and specifically to Masters and Records hereunder) of Records embodying the Masters and in connection with our record business. Notwithstanding the foregoing, we shall not use your name and likeness in connection with free promotional merchandise to be distributed to the public without your separate prior consent in each instance; provided, however, that no inadvertent failure to obtain your prior consent in any such instance shall be breach of this agreement, provided that we cease the manufacture and distribution thereof promptly after receipt of notice from you.  We shall submit to you, for your approval (which shall not be unreasonably withheld), any photographs, likenesses or biographical information that we intend to use in the promotion of Records embodying the Masters and our record business.  In the event that you object to the use of any such photographs, likenesses or biographical information, you shall give us written notice of such objection(s) within seven (7) days after we have submitted such materials to you.  Your approval shall be deemed given in the event that you shall fail to submit any such objections in accordance with the foregoing provisions of this paragraph.

(e) <u>Exclusivity.</u>  During the Term hereof, you shall not authorize any person, firm or entity other than us (a "Third Party", which term shall include you or any person or entity owned or controlled by you) the right to exploit or release on Records any Licensed Master, any New Excluded Master or any previously unreleased Master (each an "Unreleased Master"), unless such Third Party presently owns such Unreleased Master.  Further, you hereby warrant and represent that, to the best of your knowledge after reasonable investigation, no Third Party presently has the right to release any Records embodying a collection of Unreleased Masters that were delivered to such Third Party with the intent of being released as an entire Album.  Moreover, you acknowledge that, during the Term, you shall not release any Records embodying any New Excluded Masters or Unreleased Masters, and you warrant and represent that in the two (2) months prior to the date of this Agreement that you have not released any Records embodying your performances.  Notwithstanding the foregoing, provided you have fulfilled all your then-current material obligations under this Agreement, during each of the Initial Period and the Option Period you may authorize no more than three (3) Masters in the aggregate embodying your featured musical performances to be included on a so-called "soundtrack," "tribute" or "charity" album, provided that (i) no such Master embodies a composition contained in a Licensed Master hereunder; (ii) you advise us of any such authorization reasonably promptly, and (iii) we shall be given customary courtesy credit.  In addition to the foregoing, provided you have fulfilled all your then-current material obligations under this Agreement, you shall have the right to perform as a non-featured side-artist on recording projects by other artists, provided that (i) you advise us of any such performance reasonably promptly, (ii) neither your name nor likeness is used in the advertising thereof or on the packaging of Records containing such performances, and (iii) we shall be given customary courtesy credit.

(f) <u>Re-recording Restriction.</u>  You shall not record for any Third Party any musical composition embodied in any Licensed Master (each a "Licensed Composition") or authorize the release by any Third Party of any Master embodying a Licensed Composition until the expiration of the period ending the later of five (5) years from the date the Licensed Master embodying such Licensed Composition was delivered by you to us hereunder, or two (2) years after the expiration of the Term hereof (such period the "Re-Recording Restriction Period" and such restriction the "Re-Recording Restriction").

Simon.006 - 10/09/07

Page 9 of 21

000010

8.  Net Profit Split.  (a)  In consideration for the rights herein granted to us, and in lieu of traditional per unit royalties, we shall pay you fifty percent (50%) of our "Net Profits" ("Your Share of Net Profits") from the sale of Records released hereunder embodying Licensed Masters and from all other exploitation of the Licensed Masters hereunder, computed for all Licensed Masters hereunder as a single account on a consolidated basis.  Your Share of Net Profits will be exclusive of (i) mutually approved producer royalties payable to third party producers (i.e., other than you) at customary and reasonable rates approved by us, and in this regard we approve the payment of a royalty to the third party producers (collectively) of any Committed LP at a basic rate of up to 2.5% of SRLP without packaging or "standard" free goods deductions, which you acknowledge is the rough equivalent of 4% of the SRLP less a packaging deduction of 25% and "standard" free goods of 15% ("Approved Third Party Producer Royalties"); and (ii) mechanical royalties not in excess of the Mechanicals Cap, but shall be inclusive of (i) mechanical royalties in excess of the Mechanical Cap and (ii) royalties (other than Approved Third Party Producer Royalties), if any, payable to you and all third parties rendering services on or granting rights in connection with the Masters, such as a guest artist or record label entitled to the exclusive services of a guest artist.  Notwithstanding the foregoing, we will pay you, as an Expense rather than as part of Your Share of Net Profits, royalties for your services as producer of the Licensed Master entitled "Sangre Dolce", computed at the above-stated approved producer rate, prorated, and otherwise in the same manner that producer royalties are payable to the approved third party producers of LP1.

(b)  "Net Profits" shall mean "Gross Revenues" less "Expenses".

(c)  "Gross Revenues" shall mean the gross revenues actually received by or credited to StarCon or on its behalf (such amounts to be taken into account when received in the United States or credited to the account of StarCon against advances previously received by StarCon, which advances were not counted as gross revenues hereunder) in respect of the Masters, less (a) actual returns, rebates, refunds, credits and allowances, and (b) reasonable reserves against possible future returns, which reserves shall (i) take into account sales data available from Soundscan or any other source of equivalent reliability, (ii) be adjusted in accordance with changes in the returns exposure, consistent with generally accepted accounting principles ("GAAP") consistently applied, and (iii) not be taken by StarCon on Records sold by StarCon's licensees for which the licensee has taken a returns reserve in accounting to StarCon.  For clarification, Gross Revenues shall not include Starbucks retail margin on sales of records by Starbucks, if any, but rather, for (i) units of records purchased by Starbucks for sale in Starbucks outlets, or (ii) units of records sold as downloads through any website owned, operated or managed by Starbucks or any affiliate of Starbucks or through Starbucks branded pages within the iTunes music store (all of which download sales are referred to as "SEAI"), Gross Revenues shall mean the price actually paid by Starbucks or its designee to StarCon or StarCon's distributor or licensee, as applicable, for such units.

(d)  "Expenses" shall mean (i) all sums paid or incurred directly by us (and without any mark-up by StarCon in the case of amounts charged by third parties, e.g., manufacturing costs and distribution fees and expenses) in connection with the manufacture, distribution, marketing, promotion, sale or other exploitation of the Masters, including, without limitation, Recording Costs, Approved Third Party Producer Royalties, mechanical royalties not in excess of the Mechanicals Cap, distribution fees, manufacturing costs, printing or fabrication costs, shipping, handling and storage costs, video production, photography, artwork design, advertising, marketing, promotion, union per record payments, and sales or other applicable taxes, and (ii) the G&A Allowance (as hereinafter defined), but Expenses shall otherwise exclude any and all overhead and indirect expenses.  As used herein, the "G&A Allowance" shall be three percent (3%) of StarCon's gross revenues from all sources.

(e)  Coupled Albums.  For Records which do not consist entirely of the Masters (e.g., compilation albums), Gross Revenues and Expenses hereunder in respect thereof shall be determined (unless the

Simon.006 – 10/09/07

000011

parties mutually agree in writing otherwise) by multiplying StarCon's actual Gross Revenues and Expenses in respect of the applicable Record by a fraction, the numerator of which is the number of Masters contained on such Record and the denominator of which is the total number of royalty-bearing recordings contained on such Record.

(f) Joint Masters. If any Master embodies performances of another featured artist who is entitled to be paid royalties in respect thereof, then in the absence of any other written agreement, Your Share of Net Profits shall be reduced by the royalties paid to such other royalty artist(s) and any record label entitled to the exclusive services of such other royalty artist(s).

(g) Exclusion of Blanket Licensing Income. Notwithstanding anything to the contrary contained herein, you shall not be entitled to share in any fees or advances payable to us in respect of any so-called "blanket license" between StarCon and a licensee pursuant to which the licensee is granted access to all or a portion of StarCon's catalogue of master recordings. However, if StarCon shall be paid or credited by the licensee for the sale or use (excluding any public performance for which the artist's share is paid directly to artists or a collection agency, e.g., Sound Exchange, on their behalf) of a specifically identified Master (or Masters) hereunder pursuant to such blanket license, then the net amount received by StarCon in respect of such use of such Master shall be treated as Gross Revenues hereunder.

(h) Master Public Performance Income. All sums derived from the public performance of master sound recordings that are generally paid directly to recording artists and to record labels by SoundExchange and similar collection and disbursement organizations their respective portions of the public performance royalties shall not be deemed Gross Revenues hereunder.

9. Advances. Except as otherwise set forth herein, we shall have no obligation to pay you any advances against Your Share of Net Profits hereunder. However, if we pay you any sums other than (i) reimbursements of Your Actual Recording Costs, (ii) mechanical royalties due to you hereunder and (iii) other expense reimbursements due to you hereunder, such sums shall be deemed to be an advance against and a recoupable pre-payment of Your Share of Net Profits hereunder.

10. Certain Obligations With Respect To Artist. During each consecutive twelve month period of the Exploitation Period (each, a "Contract Year"), you shall receive from us an aggregate compensation of not less than the amount of the Annual Payment specified herein. The "Annual Payment" shall be nine thousand dollars ($9,000.00) in the first Contract Year, twelve thousand dollars ($12,000.00) in the second Contract Year, and fifteen thousand dollars ($15,000.00) for each of the third through seventh Contract Years.

(a) Each Annual Payment shall be payable on or before the last day of the Contract Year to which the Annual Payment is applicable. If, at least forty (40) days before the end of any Contract Year, you have not received such Annual Payment, you may so notify Company in writing of the amount of such deficiency and, provided that we pay the full amount of such deficiency within thirty (30) days of our receipt of such notice, we shall be deemed to have timely paid the Annual Payment to you. Amounts paid to you in any Contract Year in excess of the Annual Payment prescribed for such Contract Year shall reduce the amount of the Annual Payment otherwise required to be paid to you in subsequent Contract Years pursuant to this section 10.

(b) If, in addition to the Annual Payments referred to herein, any additional payments are

000012

required to preserve Company's right to equitable relief after the third Contract Year hereof pursuant to California Civil Code Section 3423 and/or California Civil Code Section 526, Company shall have the right to make such payments ("Additional Payments") to you at any time prior to seeking injunctive relief and you agree to accept such payments.

(c)    All Annual Payments and Additional Payments, if any, made by us shall be fully recoupable from all sums otherwise payable to you hereunder (except mechanical royalties).

(d)    You acknowledge and agree that the provisions of this section 10 are intended to preserve our right to seek injunctive relief to prevent a breach of this Agreement by you. If California law is hereafter changed to provide for different or additional provisions as a requisite for injunctive relief than those provisions set forth in this Agreement, and such law may be applicable to this Agreement, then we shall have the right to unilaterally amend this Agreement to comply with such law as of the effective date of such change.

## 11.  Accountings.

(a)    Royalty Account; Accounting Period:  We shall maintain a single, consolidated, fully cross-collateralized royalty account with respect to Your Share of Net Profits hereunder in respect of our exploitation of the Masters.  Within ninety (90) days after each semi-annual period ending June 30 and December 31 (an "Accounting Period" herein), we will compute Your Share of Net Profits hereunder and will deliver to you a statement for such Accounting Period setting forth such computations in reasonable detail together with the net amount of Your Share of Net Profits due, if any, after deducting any and all unrecouped advances, recoupable costs, or overpayments of any kind.  You shall reimburse StarCon on demand for any overpayments and StarCon may also deduct the amount thereof from any monies payable to you or Artist hereunder.  Amounts paid by StarCon to you on Records subsequently returned shall be deemed overpayments.  In computing Your Share of Net Profits, StarCon shall have the right to deduct all returns made at any time and for any reason.

(b)    Reserve for Returns:  We shall have the right to retain as a reserve against possible future returns a portion of the Gross Revenues that is reasonable in our business judgment, which shall take into account information known to us with respect to sell-through of the Records hereunder (e.g., sales information provided by Soundscan).  Each reserve taken hereunder shall be liquidated no later than eighteen (18) months after the reserve was established (i.e., with the statement for the third Accounting Period after the Accounting Period in which the reserve was established).

(c)    Recoupment:  All advances paid for any reason whatsoever shall be recoupable from Your Share of Net Profits payable at any time to you.

(d)    Audit Rights:  Upon thirty (30) days prior written notice to us and at your sole expense, a C.P.A. on your behalf shall have the right to audit our books and records pertaining solely to the exploitation of the Masters, for the sole purpose of verifying the accuracy of the accounting statements rendered to you hereunder.  Any such audit may not be conducted more than once for any given Accounting Period and only within three (3) years after the date a given statement was rendered, at which time each statement to which you have not notified us in writing of your objections shall be deemed to be conclusively binding upon you. Notwithstanding that Your Share of Net Profits are computed as a single, consolidated account, all amounts reported on, or used in arriving at any amount reported on, any accounting statement rendered to you shall be deemed conclusive and not subject to objection

Simon.008 - 10/09/07                                    Page 12 of 21

000013

EXHIBIT A
17

commencing three (3) years after the rendition of the statement on which such amount first appeared or was first so used. No action, suit or proceeding of any nature in respect of any royalty statement or other accounting rendered by us hereunder may be maintained against us unless such action, suit, or proceeding is commenced against us in a court of competent jurisdiction within three and one-half (3-1/2) years after the date a particular statement was rendered. Notwithstanding the foregoing, any audit initiated by you hereunder must not unreasonably interfere with our business activities and must be conducted in our offices during normal business hours by a C.P.A. who is reasonably qualified to conduct such an audit.

(e) You acknowledge that the sale of records is speculative. Subject to paragraph 12(a) below, in no event shall you have or make any claim that more Records could or should have been sold, that greater Gross Revenues could or should have been generated or collected, that the Expenses incurred could or should have been less, or that the actual Net Profits, as calculated and determined consistent with the terms and conditions hereof, could or should have been greater.

12.  **Marketing & Promotion.** (a) **Plans:** StarCon and you shall cooperate to formulate the overall general marketing plan for the release of each Committed LP on records hereunder in the United States and the Foreign Distribution Territories (the "Plan"), as follows. StarCon shall initially prepare and submit to you an outline setting forth the key elements of its proposed Plan, including press, television advertising, radio promotion, in-store merchandising, and retail marketing through both traditional retailers and any applicable non-traditional retailers for your review and approval, which you shall not unreasonably withhold or delay and which shall be deemed given except to the extent that you give StarCon timely comments thereto, including your specific proposed alternatives. StarCon shall give good faith consideration to your suggestions and shall attempt in good faith to reach mutual agreement as to all major components of the Plan; provided, however, that in the event of a disagreement with respect to any component of such Plan, StarCon's decision shall prevail. StarCon shall have the primary responsibility and authority for executing and implementing the Plan. StarCon agrees that its total budget for implementation of the Plan on a worldwide basis (including marketing, publicity, advertising and promotion) will be not less than Five Hundred Thousand Dollars ($500,000.00), but the amounts to be spent and the things for which funds shall be spent shall be subject to StarCon's business judgment, and, except if StarCon shall fail to spend at least $500,000 as aforesaid, in no event shall you make any claim that more (or less) money should have been spent or that it should have been spent on different things or at different times or any similar claim.

(b) **Artist's Marketing/Promotion Activities and Expenses:** Artist shall undertake a reasonable number of promotional activities in support of each Committed LP hereunder, and each promotional activity shall be subject to your and our mutual approval. StarCon will pay or reimburse Artist's reasonable costs of Artist's participation in promotional activities requested or approved by StarCon in accordance with a mutually approved budget in advance of the particular promotional activity, which budget shall include travel, accommodations and per diem for meals. StarCon agrees that travel and accommodations for Artist plus one person accompanying Artist will be first class. Upon such payment or reimbursement by StarCon, such amounts shall count as Expenses in computing Your Share of Net Profits hereunder.

13.  **Websites.** Artist shall retain all rights to utilize the URL "www.carlysimon.com" ("Artist Website") in connection with the website presently operated by Artist (and which Artist may continue to operate during the Exploitation Period hereof). During the Exploitation Period, StarCon may operate its own website for the purpose of marketing and promoting the Masters and in connection therewith may select a URL that is based on Artist's professional name ("Company Website") and such URL shall be subject to Artist's prior approval. If StarCon shall operate a Company Website, it shall include a link on the site to the Artist

Simon.006 - 10/09/07                          Page 13 of 21

000014

Website and the Artist Website shall include a link to the Company Website.  During the Term, Records released hereunder may be prominently featured and promoted on the Artist Website, with Artist's prior approval.  Furthermore, during the Term, you shall provide StarCon with access (i.e. user name and password) to the Artist Website so that StarCon may manage and update (with Artist's prior approval) the site with respect to the marketing and promotion of Records hereunder.  After the Exploitation Period, StarCon shall assign all rights to the Company Website to Artist.

14. Controlled Compositions; Mechanical Licenses & Royalties.  For each musical work written, composed, owned or controlled, in whole or in part, by you (a "Controlled Composition" herein) which is embodied in a Master, you hereby grant us or shall cause to be granted to us a mechanical license (including, without limitation, first-use mechanical licenses if necessary) at one hundred percent (100%) of the minimum statutory compulsory license rate applicable to a composition of less than five (5) minutes under the copyright laws of the United States, regardless of the length of the subject composition and at one hundred percent (100%) of the minimum prevailing rate in Canada, regardless of the length of the subject composition, in each case as of the date the applicable Master is or was initially released on Records hereunder (the "Controlled Rate" herein).  With respect to Records sold or distributed bearing a SRLP or wholesale price which is at least Twenty-five Percent (25%) less than the then SRLP or wholesale price, respectively, of StarCon's "top-line" Records in accordance with any applicable consent or holdback provisions in this Agreement, then the copyright royalty rate with respect to Controlled Compositions shall be three-fourths (3/4) of the rate set forth in the preceding sentence.  Notwithstanding the foregoing, you shall grant us a mechanical license on a gratis basis for any Controlled Composition which is an arrangement of a musical composition in the public domain or is non-musical material.  If any Record hereunder shall embody more than one (1) Master of a particular Controlled Composition, then StarCon shall only be obligated to pay the mechanical royalty with respect to only one (1) such Master.  Notwithstanding anything to the contrary contained herein, Artist agrees that in the United States and Canada, StarCon shall have no obligation whatsoever to pay an aggregate copyright royalty rate in respect of any Record hereunder, regardless of the number of Controlled Compositions and/or other compositions contained thereon, in excess of the following amounts:  (i) in respect of an album, twelve (12) times the Controlled Rate;  (ii) in respect of a single, two (2) times the Controlled Rate:  and (iii) in respect of a so-called extended play Record ("EP"), four (4) times the Controlled Rate (the "Maximum Mechanical Amount" herein).  In the event that the aggregate mechanical royalties for any Record hereunder exceeds the applicable Maximum Mechanical Amount, then the amount in excess of the Maximum Mechanical Amount shall be deducted from any and all sums payable to you at any time hereunder, including, without limitation, mechanical royalties and Your Share of Net Profits, payable to you at anytime.  Any mechanical royalties which are overpaid to you at anytime shall also be deducted from any and all sums payable to you at any time hereunder, including, without limitation, mechanical royalties and Your Share of Net Profits.  You hereby grant (on behalf of Artist and any music publishing company that now or hereafter owns or controls any Controlled Composition recorded by Artist hereunder) the following to StarCon with respect to all Controlled Compositions embodied in Masters hereunder, to the extent of your ownership control therein, on a gratis basis for the Territory: (i) perpetual licenses for the public performance thereof and the mechanical reproduction thereof solely for advertising and promotional purposes; (ii) the perpetual license to reprint the lyrics thereof on the album packaging and in connection with advertising and promotional purposes; and (iii) perpetual licenses to StarCon for the inclusion of any Controlled Composition in promotional videos for the Masters and perpetual licenses for the public performance of any Controlled Compositions embodied in such videos.  Mechanical royalty statements will be rendered on a quarterly basis within sixty (60) days after March 31, June 30, September 30 and December 31.  All mechanical royalties payable hereunder shall be paid on the basis

Simon.006 • 10/09/07

000015

of Records sold, paid for (i.e., excluding so-called "actual free goods") and not returned and shall be subject to the same reserves against possible future returns as specified in paragraph 8(c) above.

**15. Marketing Approvals:**

(a) Mid-Price; Budget: StarCon and its licensees shall not sell any LP hereunder in the United States as a Mid-Price Record within eighteen (18) months after its initial United States release or as a Low-Price Record during the Exploitation Period after its initial United States release without your prior written consent; provided, however, that in the event we fail to comply with the foregoing in any instance(s), your sole remedy shall be that we shall include in Gross Revenues (in lieu of the amount of Gross Revenues actually received by or credited to us) the amount that would have been received by us had we sold the applicable Records in the permissible price category. As used herein, a "Mid-Price Record" shall mean a Record in a particular configuration having an SRLP of more than sixty-five percent (65%) but less than eighty-five percent (85%) of the prevailing SRLP of our full-priced Records in such configuration, and a "Low-Price Record" shall mean a Record in a particular configuration having an SRLP of no more than sixty-five percent (65%) of the prevailing SRLP of our full-priced Records in such configuration.

(b) Premiums: StarCon and its licensees shall not sell Records embodying the Licensed Masters as so-called "premiums" without your prior written consent.

(c) Ancillary Licensing: StarCon and its licensees shall not license any one or more specified individual Licensed Masters for use in motion pictures, television programs, commercials, video games, computer software or any other non-record use or similar use without your prior written consent.

(d) Coupling: StarCon and its licensees shall not couple, or authorize any third party to couple, any Licensed Master with any other Master Recordings without your prior written consent.

(e) Remixing, Editing or Resequencing: StarCon shall not remix, edit or resequence any of the Licensed Masters without your prior written consent. However, you hereby agree that StarCon may edit a Licensed Master for the purposes of making necessary technical adjustments, for timing purposes and may create a radio edit without your prior approval or consent.

(f) Singles: StarCon shall meaningfully consult with you with respect to the release of a Licensed Master as a physical single.

(g) Inadvertent Failure: No inadvertent non-repetitive failure by StarCon to comply with the provisions of this section 15 (entitled "Marketing Approvals") shall be deemed a breach of this Agreement, but StarCon shall use commercially reasonable efforts to cure any such failure prospectively after notice.

(h) Approvals Generally: You agree that wherever you have a right of approval hereunder, your approval shall not be unreasonably withheld or delayed, and shall be deemed given unless you notify us of your disapproval and the reasons therefor within the shorter of: (i) ten (10) days; or (ii) such fewer number of days as is specified herein with respect to the particular matter, after the matter is submitted to you for approval.

**16. Representations and Warranties.** You represent and warrant that (a) you have the right to enter into this agreement and grant the rights herein granted to us and you are not under any disability, restriction or prohibition whatsoever in respect of your right to enter into and perform all of the obligations under this Agreement, (b) we shall have the right to exercise all of the rights herein granted to us free and

Simon.006 - 10/09/07

PAGE 15/21 * RCVD AT 10/15/2007 8:55:12 AM [Pacific Daylight Time] * SVR:SEAMS369/17 * DNIS:32758 * CSID: * DURATION (mm-ss):05-00.

000016

clear of any claims, liabilities or obligations to any Third Party and without the necessity of obtaining the consent of any Third Party, (c) you have not granted and will not grant or attempt to grant to any third parties rights of any kind the exercise of which would derogate from or be inconsistent with the rights granted to StarCon hereunder; (d) the Licensed Masters, the musical compositions or other material embodied therein, and all artwork and other materials furnished or selected by you for use in connection with any Records released hereunder do not and shall not violate the rights of any Third Party whatsoever, (e) you are and will remain a member in good standing of the American Federation of Musicians and any other labor union or guild in which membership is required for the performance of your services hereunder, (f) all of the Licensed Masters shall be produced in accordance with the rules and regulations of the American Federation of Musicians and all other unions having jurisdiction, (g) you own and control, without any limitations, restrictions, or encumbrances whatsoever, all rights granted to StarCon hereunder and you have obtained or will timely obtain all necessary consents, licenses (other than mechanical licenses that are not first use mechanical licenses), and permissions as may be required for the full and unlimited exercise and enjoyment by StarCon of all of the rights granted to StarCon herein; and (h) you will timely perform all obligations owing in respect of the exploitation by you and your designees of the Licensed Masters after the expiration of the Exploitation Period hereunder, including without limitation the payment of all royalties or other sums owing to any and all Third Parties. StarCon represents and warrants that StarCon (y) has the right to enter into this Agreement; and (z) is a signatory of the American Federation of Musicians.

**17. Indemnification.** Each party agrees to defend and indemnify the other party, its affiliates, licensees, successors and assigns and the officers, directors and employees of the foregoing from and against any liability, damage, cost or expense (including, without limitation, reasonable attorney's fees) occasioned by any claim, demand, action or proceeding which is inconsistent with any of the representations, warranties and agreements made herein, unless you post a bond in a form and from a bonding company acceptable to StarCon in an amount equal to StarCon's estimate of the amount of the claim, demand or action. Pending resolution of any such claim, we shall have the right to withhold any sums payable to you hereunder in an amount reasonably related to such claim. If no action is filed within one (1) year following the date on which such claim was first received by StarCon, we shall release all sums withheld in connection with such claim, unless StarCon, in its reasonable business judgment, believes that such an action may be instituted notwithstanding the passage of such time. Further, you shall reimburse us on demand for any payment made by us in connection with any such claim which is reduced to final non-appealable judgment or settled with your written consent, which consent shall not be unreasonably withheld. StarCon shall give you notice of any third-party claim, demand or action to which the indemnity applies, provided that any inadvertent failure to give you notice shall not be a breach unless you are actually prejudiced by such delay.

**18. Notices.** Any notice, consent, payment, demand, or communication required or permitted by any provision of this Agreement to be given to a party shall be in writing and shall be (a) delivered personally to the party or Person or to an officer or authorized representative of the party or Person to whom the same is directed, or (b) sent by facsimile or (c) sent by registered or certified mail or overnight courier, return receipt requested, postage prepaid, addressed as follows (or to such other address as such party or Person may from time to time specify by notice hereunder):

000017

If to StarCon:

StarCon, LLC
100 N. Crescent Drive, Suite 275
Beverly Hills, CA 90210
Fax:  (310) 385-4283
Attn: Glen Barros

And

Fax: (206) 318-2265
Attn: Ken Lombard

With a copy to:

Concord Music Group, Inc.
100 N. Crescent Drive, Suite 275
Beverly Hills, CA 90210
Fax:  (310) 385-4466
Attn:  SVP, Business Affairs and General Counsel

If to You:

Ms. Carly Simon
c/o L. Lee Phillips, Esq.
Manatt, Phelps & Phillips
11355 W. Olympic Blvd.
Los Angeles, CA  90064
Fax: (310) 312-4224

Any such notice shall be deemed to be delivered, given and received for all purposes as of: (i) the date so delivered, if delivered personally, (ii) upon confirmed receipt, if sent by facsimile, or (iii) on the date of receipt or refusal indicated on the return receipt, if sent by registered or certified mail or overnight courier, return receipt requested, postage and charges prepaid and properly addressed.

**19.  Cure.**  Neither party shall be deemed in breach of any of its material obligations hereunder unless and until the other party shall have given the alleged breaching party written notice in reasonable detail of the specific nature of such breach and the alleged breaching party shall have failed to cure such breach within thirty (30) days (ten [10] business days with respect to the payment of monies) after the receipt of such notice; provided, that the foregoing shall not be applicable to any breach which cannot be cured, e.g. the breach of a re-recording restriction.  Furthermore, nothing contained herein shall prevent StarCon from seeking immediate injunctive relief.

**20.  Assignment.**  StarCon shall have the right, at our election, to assign this Agreement during the Exploitation Period to any subsidiary, affiliated, or related company or to any entity that owns or acquires a substantial portion of our stock or assets.  No such assignment shall relieve StarCon or its assignees of any of its obligations stated herein.  After the Exploitation Period hereof, you shall have the right to assign

Simon.006 - 10/09/07

Page 17 of 21

000018

EXHIBIT A
22

this Agreement to any person, firm or entity whatsoever and you shall assume all of the obligations hereunder (including, without limitation, any union fees or other obligations) with respect to your and such assignee's exploitation of the Masters. You shall indemnify and hold StarCon harmless from any claims, losses or damages arising from your or your assignee's failure to comply with the foregoing. Any such assignee shall likewise have the right to assign this Agreement. You may not assign this Agreement without our prior written consent or our assignee's prior written consent, however, Artist may assign her right to receive all or a portion of the sums payable to Artist hereunder without restriction.

**21. Purchase of Records.** Solely for the purpose of resale at Artist's concerts, personal appearances, and the like Artist may purchase from StarCon CD's embodying Artist's LP's hereunder. Such CD's shall be sold to Artist at fifty percent (50%) of the then current SRLP for such CD. Artist will have thirty (30) days to pay its outstanding invoice(s) with StarCon for such CD's, all such payments shall be deemed Gross Revenues, and if such invoice(s) are not paid in full within 30 days, StarCon shall have the right to recoup all outstanding amounts from any monies payable to Artist by StarCon at anytime, including, without limitation, from Your Share of Net Profits, mechanical royalties and any advances under this Agreement.

**22. Miscellaneous.** Artist acknowledges that although StarCon, LLC is co-owned by Starbucks Corporation ("Starbucks") and Concord Music Group, Inc. ("Concord"), it is a separate legal entity from either of those companies. Nothing in this Agreement or any past or future communications pertaining to the subject matter hereof shall be construed as imposing any obligation upon Starbucks or Concord, it being agreed that Artist shall look solely to StarCon, LLC for the fulfillment of all obligations owed to Artist and for any and all remedies in the event of the breach or alleged breach of this Agreement. In entering into this Agreement the parties each have and shall have the status of an independent contractor. Nothing contained herein nor in the conduct of the parties and their representatives in connection herewith shall be deemed to create or evidence an agency or partnership relationship between StarCon and Starbucks, between Artist and Starbucks, or between Artist and Concord, nor shall Artist claim to be a third party beneficiary of any contractual relationship between Starbucks and Concord or that any representative of StarCon is or was acting on behalf of Starbucks or Concord, all of which potential claims are hereby disclaimed, waived and released. This Agreement shall be construed in accordance with the laws of the State of California, without regard to its choice of law provisions. Any dispute between the parties shall be submitted to mandatory, binding arbitration by a single arbitrator in Los Angeles, California in accordance with the rules of the American Arbitration Association. Each party shall bear one-half (1/2) of the costs of such arbitration, except that the arbitrator shall have the discretion to award costs and/or outside reasonable attorney's fees to either party. You agree that we shall not be required to make any deductions or payments in respect of workers compensation or social security insurance. No person is intended to be or will be a third party beneficiary of this Agreement. This Agreement sets forth the entire agreement between the parties with respect to the subject matter hereof and may only be modified by a written instrument which is signed by both parties. If any provision of this Agreement is deemed unenforceable or void, the balance of the Agreement shall remain in full force and effect. The section headings contained herein are for convenience only and shall not be given any effect in construing the meaning of this Agreement. The failure of either party to enforce any provision of this Agreement shall not be construed as a waiver or limitation of that party's right to subsequently enforce and compel strict compliance with every provision of this Agreement. You and we hereby acknowledge and agree that neither party is entering into this Agreement on the basis of any representations or

Simon.008 - 10/09/07

PAGE 18/21 * RCVD AT 10/15/2007 8:55:12 AM [Pacific Daylight Time] * SVR:SEAMS369/17 * DNIS:32758 * CSID: * DURATION (mm-ss):05-00

000019

EXHIBIT A
23

promises not expressly contained herein.  This agreement shall not be binding upon StarCon and Artist until duly executed by Artist and StarCon.

Should you agree that the above terms adequately set forth our understanding and agreement, please sign this letter where indicated below.

Very truly yours,
StarCon, LLC
d/b/a Hear Music

By: _____
Its:   CHIEF MANAGER

Agreed and Accepted:

_____
Carly Simon
Soc. Sec. No.:   **Redacted**

Simon.006 - 10/08/07                    Page 19 of 21

PAGE 19/21 * RCVD AT 10/15/2007 8:55:12 AM [Pacific Daylight Time] * SVR:SEAMS369/17 * DNIS:32758 * CSID: * DURATION (mm-ss):05-00

000020

EXHIBIT A
24

**Exhibit A**

This **Exhibit A** is annexed to and forms part of the Agreement between StarCon, LLC, on the one hand, and Carly Simon, on the other hand, dated as of August 9, 2007.

Existing Masters:

1.

2.

3.

4.

5.

6.

7.

8.

9.

10.

000021

**Exhibit B**

This Exhibit B is annexed to and forms part of the Agreement between StarCon, LLC, on the one hand, and Carly Simon, on the other hand, dated as of August 9, 2007.

Approved LP1 Compositions:

1.

2.

3.

4.

5.

6.

7.

8.

9.

10.

Simon.006 – 10/09/07                    Page 21 of 21

PAGE 21/21 * RCVD AT 10/15/2007 8:55:12 AM [Pacific Daylight Time] * SVR:SEAMS369/17 * DNIS:32758 * CSID: * DURATION (mm-ss):05-00

000022

EXHIBIT A
26